UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

FILED/REC'D
2023 DEC 22 A 11: 11
CLERK OF COURT
U.S. DISTRICT COURT
W D OF WI

THE UNITED STATES OF AMERICA *ex rel.*;
EDWARD RYAN;

    Plaintiffs,

v.

ASPIRUS, INC.,

    Defendant.

COMPLAINT FOR DAMAGES and INJUCTIVE RELIEF UNDER THE FALSE CLAIMS ACT
*QUI TAM* ACTION FILED UNDER SEAL

    NOW COME the Plaintiffs, the United States of America *ex rel.* Edward Ryan and, through their attorneys, the office of the United States Attorney General, and Alan C. Olson & Associates, S.C., by Alan C. Olson; and, as and for a Complaint against the Defendant, Aspirus, Inc., alleges and shows to the Court, as follows:

## NATURE OF CASE

    1.    This is a *qui tam* action in which Plaintiff-Relator, Edward Ryan, Wisconsin Regional Director of Defendant, Aspirus, Inc., sues to recover losses sustained by the Medicare and Medicaid programs through the submission of false or fraudulent claims for payment in violation of the False Claims Act ("FCA"), [31 U.S.C. §3729, *et seq.*].

    2.    Medicaid is a joint federal and state funded healthcare program that provides basic medical insurance to qualified residents of the United States with low incomes. Medicaid is not a free healthcare program, as United States citizens, through their taxes, pay a majority of the Medicaid program's costs.

3. Medicare is a Health Insurance program for the aged and disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. §§1395 *et seq.*

4. Aspirus, Inc. significantly funds its operations and its employees through receipt of Medicaid and Medicare dollars.

5. Ryan alleges that Defendant is liable under the False Claims Act, 31 U.S.C. §§3729 *et seq.*, due to Defendant's conduct in submitting false and fraudulent records, statements, and claims for payment by the United States to the Medicare program and conspiring to violate the False Claims Act.

## JURISDICTION AND VENUE

6. Jurisdiction over the claims of the United States of America *ex rel.* Edward Ryan under the FCA, [31 U.S.C. §3729, *et seq.*] is conferred on this Court by 28 U.S.C. §§1331, 1345 and 31 U.S.C. §3732(a). In this *qui tam* action under the FCA, the Plaintiff sues on behalf of and in the name of the government and invokes the standing of the government resulting from the fraud injury.

7. The Western District of Wisconsin is the proper federal venue for this action pursuant to 28 U.S.C. §1391, in that Defendant, Aspirus, Inc., can be found within the Western District and the unlawful actions occurred in the Western District.

## CONDITIONS PRECEDENT

8. All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have occurred.

## JURY DEMAND

9. The United States of America *ex rel.* Edward Ryan demands that this matter be tried to a jury of Ryan's peers.

PARTIES

10.     Plaintiff, the United States of America, ("the Government") is a sovereign country whose Department of Health and Human Services pays claims submitted by the Defendant through the Medicare program for services rendered and provided by the Defendant.

11.     Plaintiff, the Government, effectively assigns the Government's claims under the FCA to Relator, Edward Ryan, who may sue based upon an injury to the federal treasury.

12.     Plaintiff-Relator, Edward Ryan, is an adult citizen of the United States, residing at 190 E. Parkway Dr., Boise, ID 83706.

13.     Defendant, Aspirus, Inc., is a not-for-profit, non-stock corporation, with principal offices located at 32200 Westwood Dr, Wausau, WI 5440.

THE FALSE CLAIMS ACT

14.     The False Claims Act provides, in pertinent part, that any person who

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C)     conspires to violate any part of 31 U.S.C. § 3729(a)(1)(A)-(G), is liable to the United States Government for statutory damages and such penalties as are allowed by law, including treble damages. 31 U.S.C. §§ 3729(a)(1).

The False Claims Act further provides that "knowing" and "knowingly"

(D)     mean that a person, with respect to information--

(i)     has actual knowledge of the information;

3

        (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

        (iii)    acts in reckless disregard of the truth or falsity of the information; and

    (E)    require no proof of specific intent to defraud. 31 U.S.C. §3729(b) 2006), amended by, 31 U.S.C. § 3729(b)(1).

## THE MEDICARE PROGRAM

15. Title XVIII of the Social Security Act, 42 U.S.C. §§1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (the "Medicare Program" or "Medicare").

16. The Medicare Program is comprised of four parts. Medicare Parts C and D are not directly at issue in this case.

17. The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through CMS. CMS, in turn, contracts with Medicare Administrative Contractors, formerly known as "fiscal intermediaries" (hereinafter "MACs") to review, approve, and pay Medicare bills, called "claims," received from healthcare providers. In this capacity, the MACs act on behalf of CMS.

18. Payments are typically made directly to healthcare providers, such as Defendant, rather than to the patient. This occurs when the Medicare recipient assigns his or her right to payment to the provider, such as Defendant. In that case, the provider submits its bill directly to Medicare for payment.

19. In order to bill the Medicare Program, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form. When the CMS-1500 form is submitted, the provider certifies that the description of services in question is "true, accurate, and complete".

20. All healthcare providers, including Defendant, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Parts A and B. A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services.

21. Medicare Part B covers emergency and nonemergency ambulance services when they are medically necessary. Medicare covers 80% of eligible transport costs.

22. Because it would not be feasible to review medical documentation before paying each claim, the MACs generally make payment under Medicare Part B on the basis of the providers' certification on the Medicare claim form that the services in question were coded correctly. The claims are paid from the Medicare Trust Funds, funded by American taxpayers.

MEDICARE CODING FOR AMBULANCE SERVICES

23. There are several Healthcare Common Procedure Coding System (HCPCS) codes used in ground ambulance transports: A0425: Ground Mileage; A0426: Advanced Life Support ("ALS") 1-Non-Emergency A0427: ALS1-Emergency; A0428: Basic Life Support ("BLS")-Non-Emergency; A0429: BLS-Emergency; A0433: ALS2; and, A0434: Specialty Care Transport (SCT).

24. A typical ambulance charge is comprised of a base rate of one of the level charges (A0426-A0434) plus the number of patient transport miles times the Ground Mileage (A0425) rate per mile. Relevant to this Complaint are the BLS and ALS1 level base rates.

25. The base fee is determined by the level of care and interventions administered to the patient. For example, a patient with no intervention other than monitoring vitals and stretcher transport would qualify for BLS level base fee (either A0428 or A0429). One of the ALS level charges would apply if the patient received an IV, medications, cardiac monitor, or other ALS interventions. It is up to providers, EMTs, Paramedics and Nurses to document care that appropriately reflects the level of care and interventions administered to a given patient. It is up to the billing service to determine and assign the appropriate level of care based on the documentation received.

26. An "emergency response" means "responding immediately at the BLS or ALS1 level of service to a 911 call or the equivalent in areas without a 911 call system. 42 CFR § 414.605. Responding immediately means the ambulance entity begins as quickly as possible to take the steps necessary to respond to the call. However, "[m]ost transports that occur between hospital facilities should not be categorized as emergency level trips" (CMS Staff).

27. "Where the dispatch was inconsistent with this standard of protocol, including where no protocol was used, the beneficiary's condition (for example, symptoms) at the scene determines the appropriate level of payment." Medicare Policy Manual, Chapter 10 §30.1.1.

## OPERATIVE FACTS

28. Defendant, Aspirus, Inc. ("Aspirus") is a hospital licensed by the State of Wisconsin.

29. Aspirus MedEvac is Aspirus' medical transportation service.

30. Golden Hour is located at 10052 Mesa Ridge Court San Diego, CA 92121, and has been providing Aspirus with billing and collection services regarding medical transportation since 2008.

31. Plaintiff, Edward Ryan, commenced his employment with the predecessor of Aspirus on March 29, 2013 and currently holds the position of Regional Director of Aspirus MedEvac.

32. Ryan reports to Jason Keffeler, Aspirus System Director, who works at the Aspirus headquarters in Wausau, Wisconsin.

33. During April 2023, Ryan reviewed Aspirus MedEvac data around BLS transports, to create a business plan for an ambulance to be staffed only by EMTs instead of paramedics and nurses.

34. On April 25, 2023, Ryan stated, in a regularly scheduled meeting with Golden Hour and MedEvac leadership, including Lesa Melbostad, Golden Hour Compliance Manager, that Aspirus was improperly billing for ambulance services based on a sample of 80 accounts.

35. On April 27, 2023, Ryan and others, including Logan Chojnowski, Aspirus Finance Director, received an email from Melbostad with preliminary findings for 12,974 ambulance accounts during 2022.

36. On April 27, 2023, Ryan discussed his specific concerns with Chojnowski regarding dispatch protocols, the distinction between ALS and BLS, and how the services are supposed to be coded and billed.

37. On May 10, 2023, Ryan received an email from Melbostad outlining Ryan's concerns regarding dispatch protocols and the distinction between ALS and BLS and how the services are supposed to be coded and billed.

38. On May 12, 2023, Ryan emailed his concerns that Aspirus is billing accounts as "emergency", i.e. ALS, when the account should be billed as "non-emergency", i.e., BLS.

39. On May 31, 2023, Bob Kirkley, Aspirus MedEvac Regional Manager, sent an

update on dispatch priorities to the Aspirus MedEvac dispatchers.

40. On June 8, 2023, Ryan received an email from Meldbostad recommending that Golden Hour perform an internal audit for Aspirus' review and making modifications to dispatch procedures.

41. On June 8, 2023, Ryan received an email from Chojnowski asking about refunds, rebilling of claims, and expansion of the audit sample size.

42. On June 9, 2023, Ryan received an email from Meldbostad that she would scrub the data, looking back 90 days.

43. On June 19, 2023, Ryan emailed Chojnowski with his concerns about Aspirus' improper coding and billing and asked for his input on a draft of Ryan's Situation, Background Assessment and Recommendation (SBAR).

44. On June 20, 2023, Ryan emailed his SBAR to Keffeler.

45. Ryan's SBAR documented, in pertinent part, as follows:

   a. Aspirus is upcoding patient accounts to an Emergency code (A0427 or A0429) that should be a non-Emergency code (A0426 or A0248);

   b. From a sample of 80 BLS-Emergency (A0429) and ALS1-Emerency (A0427) interfacility transports during the time period May 2020 to April 2023, Ryan determined that 90% of the transports leveled as "Emergency" should have been classified as "Non-Emergency";

   c. 79% of interfacility transports in 2022 were coded as Emergency (A0427, A0429), which exceeds the industry standard that a majority of interfacility transfers should fall into the Non-Emergency ALS1 category (A0426) or BLS-Non-Emergency (A0428); and

8

d. The charges and number of transports in calendar year 2022 alone could result in a significant financial impact on Aspirus.

e. Aspirus MedEvac is not a 911 service;

f. Aspirus MedEvac does not have 911 equivalent dispatch protocols in place;

g. the act of dispatching MedEvac ambulances to interfacility transfers does not meet the equivalent criteria as a 911 service;

h. Golden Hour erroneously relies on the Aspirus dispatch protocols, in which, "dispatch priority = emergency" in Flight Vector$^{TM}$ (MedEvac's dispatch software) to justify an Emergency response;

i. Aspirus MedEvac's dispatch is not the equivalent of a 911 dispatch center;

j. Aspirus MedEvac's interfacility dispatch priorities are based on the known patient condition as reported by Physician Connect Line (PCL), an intake center to coordinate patient transfers and bed placement, or the sending facility versus a 911 call where the patient's medical condition is unknown;

k. The vast majority of Aspirus' interfacility patients are stabilized and their transfers do not qualify for the Emergency base rate code;

l. MedEvac almost always meets the minimum BLS service standard for each medical transport;

m. ALS is a higher level of care, defined by the State scope of practice for ALS providers (Advanced EMT's, Paramedics and Nurses);

n. In order to code as ALS, care must be provided by an ALS provider that is beyond the scope of a Basic Emergency Medical Technician (EMT-B) and includes the provision of the necessary supplies and services including the

9

provision of an ALS assessment (in an Emergency response) and/or at least one ALS intervention (such as administering medications, cardiac (EKG) monitoring, etc.); and

o. Golden Hour, in their review of the sample of 80 accounts, notes that, many of the charts coded as BLS-Emergency (A0429), could have been coded as ALS1-Emergency (A0427) if an "ALS Assessment" was performed. To the contrary, the "ALS assessment" intervention only applies to A0427 (ALS1-Emergency); if an Emergency does not exist, and ALS assessment cannot be used to justify coding a patient transport to the ALS level.

46. On July 5, 2023, Ryan received an email from Scott Remmich, Chief Compliance Officer, requesting the password to the spreadsheet identifying accounts to be audited for billing errors.

47. In or around the week of July 10, 2023, a meeting was conducted by personnel from Golden Hour, Aspirus Finance and Aspirus Compliance.

48. Prior to the meeting that took place in or around the week of July 10, 2023, Ryan asked Keffeler why he was excluded. Keffeler responded that Ryan need not worry as it was merely a routine meeting.

49. During the meeting that took place in or around the week of July 10, 2023, it was decided that Golden Hour would do an internal audit and Aspirus Finance would hold in reserves $300,000 to $500,000 in the next fiscal year as a contingent liability for a payback to Medicare, Medicaid and others.

50. On July 17, 2023, Ryan and Melbostad exchanged emails describing a plan for Golden Hour's internal audit focusing on government payers.

10

51. On July 18, 2023, Kay Connor, Aspirus Director of Revenue Cycle – Risk, introduced her involvement in the audit process as Remmich would soon be leaving the organization. In addition, Remmich introduced Lori Scheller, Aspirus Compliance Partner.

52. On July 18, 2023, Ryan emailed Scott Remmich and several individuals in Compliance and Finance, his concerns regarding improper billing. This included the SBAR detailing the billing concerns that had been sent to Keffeler on June 20, 2023.

53. On July 20, 2023, Remmich thanked Ryan by email for bringing the improper billing issue forward.

54. On July 20, 2023, Ryan met with personnel from Golden Hour, Aspirus Finance, Aspirus Compliance, and Aspirus MedEvac, including Remmich and Eric Anderson, SVP of Service Line and Patient Experience, as interim Compliance Officer. It was decided during this meeting that an outside independent firm would conduct the audit instead of Golden Hour. In the meantime, Aspirus MedEvac agreed to update and correct dispatch errors and Golden Hour would submit corrections for the known errors in the original sample of 80. Keffeler falsely assured the group that the dispatch issues had already been addressed.

55. On July 27, 2023, emails were exchanged between Ryan and Kirkley regarding dispatch priorities in response to a presentation by Michael Clark, MD, Aspirus MedEvac Medical Director.

56. On November 29, 2023, Ryan was notified by email from Golden Hour that it had not received the revised Aspirus dispatch priority policy.

57. Medicare pays significantly more for emergency transport services than for non-emergency transport services.

58. Medicare beneficiaries are responsible for copayments of 20 percent of the

Medicare-approved amount for Part B ambulance services. Therefore, beneficiaries generally are responsible for higher copayments for most emergency transport services.

## COUNT ONE
### (FALSE CLAIMS ACT-31 U.S.C. § 3729(A)(1)(A))

59.  As and for a first Count, Ryan and the United States of America re-assert the allegations recited above and fully incorporate those paragraphs herein by reference.

60.  The allegations more particularly described above constituted fraudulent claims for payment by the Defendant to the United States of America in violation of the FCA, [31 U.S.C. § 3729, *et seq.*].

61.  By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per claim. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999. 31 U.S.C. § 3729(a)(1)(G).

## COUNT TWO
### (FALSE CLAIMS ACT-31 U.S.C. § 3729(A)(1)(B))

62.  As and for a second Count, Ryan and the United States of America re-assert the allegations recited above and fully incorporate those paragraphs herein by reference.

63.  The allegations more particularly described above constituted material false certification by the Defendant to the United States of America, in violation of the FCA, [31 U.S.C. §3729, *et seq.*].

64.  By reason of the foregoing, the United States suffered actual damages in an

amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Defendant Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## COUNT THREE
### (FALSE CLAIMS ACT-31 U.S.C. § 3729(A)(1)(C))

65. As and for a third Count, Ryan and the United States of America re-assert the allegations recited above and fully incorporate those paragraphs herein by reference.

66. The allegations more particularly described above constituted conspiracies to violate the False Claims Act in presenting false claims for Medicaid and Medicare money, making false records in support of claims for Medicaid and Medicare money, and avoiding the Defendant's obligations to refund Medicaid and Medicare money that was overpaid and/or overbilled.

Wherefore Plaintiff, the United States of America *ex rel.* Edward Ryan, demands relief as follows:

    a. Judgment against the above-named Defendant awarding Ryan at least 15 percent but not more than 30 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which Ryan substantially contributed to the prosecution of the action;

    b. Judgment against the above-named Defendant awarding Ryan an amount for reasonable expenses which the Court finds to have been necessarily incurred;

    c. Judgment against the above-named Defendant awarding Ryan an amount for

reasonable attorneys' fees and costs; and

d. Such other relief as the Court deems just and equitable.

Dated this 20th day of December, 2023.

*Electronically signed by Alan C. Olson*
Alan C. Olson, Bar Number: 1008953
Attorneys for Plaintiff-Relator
Alan C. Olson & Associates, S.C.
2880 S. Moorland Rd.
New Berlin, WI 53151
Telephone: (262) 785-9606
Fax: (262) 785-1324
Email: AOlson@Employee-Advocates.com
